IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 01-30256
Summary Calendar

_____

PENNZENERGY CO.;ET AL.,

                                        Plaintiffs,

PENNZENERGY EXPLORATION AND PRODUCTION, LLC;
DEVON ENERGY CORP., formerly known as Pennzenergy Co.,

                    Plaintiffs-Counter Defendants-Appellees,

versus

CAROLYN WELLS: ET AL.,

                                        Defendants,

CAROLYN WELLS; SAMUEL WELLS; YULANDER WELLS; RENA WELLS; ANTHONY
WELLS; LESTER WELLS; JESSE WELLS,

                    Defendants-Counter Claimants-Appellants.


_____

No. 01-30264
Summary Calendar

_____

CAROLYN IVY,

                                        Plaintiff-Appellant,

versus

PENNZENERGY CO., ET AL.,

                                        Defendants,

PENNZENERGY EXPLORATION AND PRODUCTION, LLC:
DEVON ENERGY CORP., formerly known as Pennzenergy Co.,

                                        Defendants-Appellees.
                    --------------------
          Appeals from the United States District Court
             for the Western District of Louisiana
                   (99-CV-959 & 01-CV-83)
                    --------------------

December 17, 2001

Before HIGGINBOTHAM, WIENER, and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

In the first of two actions that have been consolidated on appeal, Defendants-Appellants Carolyn Wells, Samuel Wells, Yulander Wells, Rena Wells, Anthony Wells, Lester Wells, and Jesse Wells (collectively, "the Wellses") seek reversal of the district court's grant of summary judgment in favor of Defendants-Appellees Devon Energy Corporation (successor by merger to PennzEnergy Company) and Devon Energy Production Company, L.P. (successor by merger to PennzEnergy Exploration and Production, L.L.C.) (collectively, "Devon"). In the second of the consolidated actions, Plaintiff-Appellant Carolyn [Wells] Ivy[1] seeks reversal of the district court's <u>sua</u> <u>sponte</u> dismissal of her related lawsuit. Because we conclude that the district court ruled correctly in granting summary judgment in favor of Devon, we affirm the summary judgment. Likewise, the court's <u>sua</u> <u>sponte</u> dismissal of Carolyn Ivy's suit was correct, so we affirm that dismissal as well.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Carolyn Wells, a Defendant-Counter Claimant in the first above-styled suit, is one and the same person as Carolyn [Wells] Ivy, the Plaintiff in the second above-styled suit.

I. Facts and Proceedings

The disputes in these cases center on the contractual, statutory, and legal duties arising between a Lousiana mineral lessee and its lessors. The facts are not seriously contested.

In December 1947, Mary S. Watson (an ancestor of the Wellses) and others granted an oil, gas, and mineral lease to Devon's predecessor in interest, Union Producing Company; and in 1953, the same parties entered into an Amendment and Ratification of Pooling Agreement. These documents (collectively, "the Watson Lease") affect lands in the Sligo Field, Bossier Parish, Louisiana —— including the N/2 of the SE/4 of Section 15, Township 17 North, Range 12 West ("Tract 1"), which the Wellses own or once owned. The Watson Lease contains a provision typically found in Louisiana oil and gas leases of that era, outlining the effect of a transfer of ownership that affects the interest of the lessor:

> If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is hereby expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, successors or assigns, but no change in the ownership of the land or assignment of rentals or royalties shall be binding on the Lessee until after the Lessee has been furnished with a certified copy of the recorded instrument evidencing such transfer.

In 1959, Mary Watson died intestate. According to the Wellses, Mary Watson's estate was inherited by Mary G. Wells (Mary Watson's granddaughter and the Wellses' mother). In 1962,

Mary G. Wells died intestate.  Devon asserts that, in accordance

with the transfer of ownership provision quoted above, it

suspended further royalty payments pending receipt of record

evidence that the interest of Mary G. Wells had devolved to her

heirs.  In 1979, Yulander Wells (a son of Mary G. Wells, and a

defendant in this action) contacted Devon seeking release of the

suspended royalty payments.  Devon replied to Yulander Wells's

written request as follows (emphasis ours):

> In as much as the information you furnished
> is appreciated, we still need the estate
> documentation that such a trust was set up.[2]
> We are enclosing our Louisiana requirements
> for payment of royalties and our suggested
> affidavit of heirship form.  Please have this
> form completed while following the guideline
> of our requirements.  Upon receipt of this
> information, we will be in a better position
> to release accruals.

None dispute that the Wellses did not provide Devon with a

judgment of possession evidencing the Wellses' inheritance of an

interest in the Watson Lease.  Yulander Wells did, however,

return to Devon the completed Transfer Order and Affidavit of

Heirship forms, on the strength of which Devon released the

suspended royalties to the Wellses in 1980.  In addition to

disbursing some 18 years' accumulated back royalties, Devon

commenced paying royalties to the Wellses on subsequent mineral

production, even though the royalties paid to individual family

_____

[2] The trust to which this excerpt refers was "a long-standing trust fund set aside by [Mary G. Wells]" described by Yulander Wells, into which "[a] certain percentage of the profits obtained from the leasing of [Tract 1] was to be placed...."

4

members, based on their purported interests, totaled less than $3.00 in some months.

In 1999, the Wellses began to send demand letters to Devon, threatening litigation and alleging that Devon had not paid all the royalties due on Tract 1, had wrongfully paid royalties for production on other tracts to other individuals when in fact the royalties should have been paid to the Wellses, and had committed trespass, conversion, and other torts. In their "final" demand letter, the Wellses expressed a willingness to "settle this matter in good faith quickly and quietly," proposing that Devon pay "$46 million to settle all claims, known or unknown, that [the Wellses] have against [Devon] and its directors and officers."

Devon had replied to the previous demand letters, asking for clarification on some points, correcting errors on others, and explaining its position on the matters about which the Wellses' contentions were concrete and intelligible. In response to the "final" demand letter, however, Devon filed a declaratory judgment action in May 1999, pursuant to 28 U.S.C. § 2201, in the United States District Court for the Western District of Louisiana, designating the Wellses as defendants (the "Declaratory Action"). In the Declaratory Action, Devon sought, inter alia, a ruling that the claims stated in the demand letters were unfounded and that Devon had performed all of its obligations to the Wellses arising out of its mineral operations in the Sligo Field in Bossier and Caddo Parishes, Louisiana. The

Wellses filed their counterclaim in June 2000, and in September 2000, Devon filed a motion for summary judgment.

A few days later, also in September 2000, Carolyn Wells Ivy filed an action in Illinois state court against Devon (the "Ivy Suit"), grounded in the same set of operable facts as the Declaratory Action, and alleging a conspiracy to commit fraud, fraudulent concealment, violation of the Illinois Antitrust Act, and mail fraud. Devon removed the Ivy Suit to the United States District Court for the Northern District of Illinois, and in December 2000, that district court granted Devon's motion to transfer the Ivy Suit to the Western District of Louisiana (where the Declaratory Action's motion for summary judgment was pending), on the ground that the Ivy Suit arose out of the same transaction or occurrence as the Declaratory Action.

The following month, the district court for the Western District of Louisiana issued two memorandum rulings. In the first ruling, pertaining to the Declaratory Action, the court denied the Wellses' motion to dismiss the suit, and granted Devon's motion for summary judgment. As to the Lease-based claims, the court found that Devon had no obligation to make royalty payments to the Wellses under the Watson Lease because the Wellses had failed to provide the necessary instruments to Devon evidencing their ownership interests in the Watson Lease.[3]

---

[3] The court expressly declined to address Devon's alternative claims that (1) the Wellses' demand letters failed to satisfy the requirements of Louisiana's Mineral Code, (2) Devon's responses to the demand letters provided reasonable cause under the Mineral Code for nonpayment of royalties, and (3) the royalty

As to the non-Lease-based allegations in the demand letters, the court found that claims grounded in those contentions had never been asserted — as they had to be — as compulsory counterclaims in the Declaratory Action, so that the Wellses were forever barred from asserting them.

In the second ruling, pertaining to the Ivy Suit, the district court dismissed the action <u>sua</u> <u>sponte</u>, concluding that the claims stated in it should have been pled affirmatively as compulsory counterclaims in the Declaratory Action, which had been filed first and in which Carolyn Wells Ivy was a named party defendant; so that Ms. Ivy was barred from asserting them in the subsequently filed Ivy Suit. The Wellses and Ms. Ivy timely appealed the grant of summary judgment in favor of Devon and the dismissal of the Ivy Suit.

## II. Analysis

### A. Standard of Review

We review a grant of summary judgment *de novo*, applying the same standard as the district court.[4] A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact.[5] An issue is material if its resolution

---

claims related to periods before March 1996 had prescribed under Louisiana Civil Code article 3494(5)'s three years liberative prescription.

[4] <u>Morris v. Covan World Wide Moving, Inc.</u>, 144 F.3d 377, 380 (5th Cir. 1998).

[5] Fed.R.Civ.P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

could affect the outcome of the action.[6]  In deciding whether a fact issue has been created, we must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.[7]

The standard for summary judgment mirrors that for judgment as a matter of law.[8]  Thus, the court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence.[9]  In reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached.[10]

We review de novo the district court's dismissal of the Ivy Suit.[11]

---

[6] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[7] See Olabisiomotosho v. City of Houston, 185 F.3d 521, 525 (5th Cir. 1999).

[8] Celotex Corp., 477 U.S. at 323.

[9] Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000).

[10] Id. at 151.

[11] The district court cited Federal Rule of Civil Procedure 13(a), governing compulsory counterclaims, when it dismissed the Ivy Suit.  As explained more fully below, see infra, section IIC., we treat this dismissal as a dismissal for failure to state a claim for which relief can be granted, reasoning that there is no set of facts that Ivy can present that would lead to her success, because the claim itself is barred.  Dismissals for failure to state a claim are reviewed de novo.  Kennedy v. Tangipahoa Parish Library Bd. of Control, 224 F.3d 359, 365 (5th

B. The Declaratory Judgment Action

     The Wellses advance four grounds in their appeal of the grant of summary judgment in favor of Devon: (1) The district court erroneously chose to apply Louisiana law; (2) the district court did not have subject matter jurisdiction; (3) "the appellees' false statements contained in their motion [for] summary judgment regarding a material issue in this litigation constitute grounds for reversal" of the ruling, and (4) Devon waived strict compliance with the mineral lease's requirement that "a certified copy of the recorded instrument evidencing...[a] transfer" must be provided, when it furnished the Transfer Order and Affidavit of Heirship forms to the Wellses, released the suspended royalties on the strength of the completed forms, and continued to pay subsequent royalties.[12] For the reasons set forth below, we discern no merit in the first three grounds for appeal.  Although there is some merit to the fourth ground, we conclude that the Wellses failed to present

---

Cir. 2000) ("We apply de novo review to dispositive motions, like dismissals for failure to state a claim and grants of summary judgment.").

     [12] The Wellses also contend that the district court in Louisiana lacked personal jurisdiction over them.  Setting aside the fact that they have long since waived any challenge to personal jurisdiction they might have had, this contention is scarcely developed in their brief.  "[T]here is authority within this Circuit that a party who inadequately briefs an issue waives the claim."  Shell Offshore, Inc. v. Office of Worker's Comp. Programs, 122 F.3d 312, 317 (5th Cir. 1997) (citing Cinel v. Connick, 15 F.3d 1338, 1345 (5th Cir.1994); Villanueva v. CNA Ins. Companies, 868 F.2d 684, 687 n. 5 (5th Cir.1989)).  Invoking that authority, we decline to address this issue further.

evidence sufficient to survive Devon's motion for summary judgment, and therefore affirm the district court's grant of summary judgment.

### 1. Choice of Law

The Wellses first contend that the district court was required to conduct the choice of law analysis specified in Louisiana Civil Code article 3515, that the court failed to do so, and that it erroneously applied Louisiana law. Civil Code article 3515, appearing in Book IV, states that "[e]xcept as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue."[13] It then lists particular factors to be weighed in determining which state's law should be applied. The Wellses advance several reasons why they believe that the laws of other states, especially the laws of Illinois, should be applied. They fail, however, to account for the initial caveat in article 3515, "[e]xcept as otherwise provided in this Book"; and it is "otherwise provided" in Book IV that "[r]eal rights in immovables situated in this state are governed by the law of this state,"[14] and that "[w]hether a thing is an immovable is determined according to the substantive law of the state in which

_____

[13] La.Civ. Code art. 3515 (emphasis added). The "Book" to which article 3515 refers is Book IV, Conflict of Laws.

[14] Id. art. 3535.

10

the thing is situated."[15]  In addition, Louisiana's Mineral Code clarifies that "[a] mineral right is an incorporeal immovable."[16] As the entire controversy in this action concerns obligations and entitlements created by the Watson Lease, and that lease pertains to minerals that are located entirely in Louisiana, the district court correctly chose to apply Louisiana law.[17]

## 2. Subject Matter Jurisdiction

The Wellses next contend that the federal court sitting in diversity lacked subject matter jurisdiction because the requisite amount was not in controversy.[18]  This position is simply untenable given the Wellses' express affirmation in their Counterclaim that "[j]urisdiction is proper in this Court...pursuant to 28 U.S.C. § 1332..., in that this is a case between citizens of different states..., and the matter in controversy exceeds $75,000.000, exclusive of interest and costs."  The Pretrial Order, drafted pursuant to a telephone conference between the parties, asserts the same, and affirms that jurisdiction is uncontested.  The Wellses cannot now advance

---

[15] Id.

[16] La. Rev. Stat. 31:18.

[17]  In fact, the Wellses themselves asserted in their Counterclaim that "[t]he substantive laws of the State of Louisiana (mineral and otherwise) control the controversy between the parties."  This, coupled with the fact that the Wellses did not reference choice of law as a contested issue in the pretrial order or otherwise preserve the matter for appeal, strengthens the already-dispositive statutory mandate to apply Louisiana law in this action.

[18] Diversity of citizenship between the parties is not contested.

11

deficiencies of the amount in controversy to defeat jurisdiction.[19]

### 3. Material Misrepresentation

The Wellses' third argument on appeal appears to run as follows:  When the district court ruled that Devon had no obligation to make royalty payments to the Wellses because Devon was never provided with the type of document evidencing a transfer of ownership that the Watson Lease expressly required, the court was relying on material factual misrepresentations by Devon.  Accepting arguendo that the  Watson Lease requires a judicial decree, the Wellses contend that Devon in fact had a judicial decree resulting from a 1979-1980 action entitled A.C. Skannal v. Jack Watson et al., and that the judicial decree from A.C. Skannal touched on the Wellses' surface rights in Louisiana property.  The Wellses therefore conclude that Devon's assertion that it was never provided with the requisite judicial decree

---

[19] Devon correctly points out that, even if the plaintiff's complaint —— like Devon's —— asserts that the amount in controversy requirement is met, the claim may still be dismissed if it appears to a legal certainty, from the face of the complaint or other evidence, that the claim is actually for less than the jurisdictional amount.  De Aguilar v. Boeing Co., 47 F.3d 1404, 1409 (5th Cir. 1995).  Devon also correctly notes, however, that it did not appear to a legal certainty that less than $75,000 was at issue here, especially considering the serious nature of the allegations raised in the Wellses' demand letters, and the proposed "settlement" amount in those same letters of $46 million.  This alternative method of defeating diversity jurisdiction therefore fails as well.

constitutes a material representation, such that the district court's ruling (which relied on it) must be reversed.[20]

It is by no means clear that a document evidencing the sale of surface rights is even relevant to a dispute centering on mineral rights. Even if it is relevant, however, Devon answers the Wellses' argument conclusively by observing that we are precluded from considering the A.C. Skannal judgment because that document was not presented to the district court and is thus not part of the record on appeal.[21] The Wellses' argument that they did not learn of the 1979 A.C. Skannal action until November 2000 is unavailing. Because the 1979-1980 documents were discovered in 2000, they presumably could have been discovered, with diligent investigation, in time to present them to the district court. We therefore decline to address further this argument by the Wellses.

4. Waiver

The Wellses' last signficant argument on appeal is that Devon "actually waived [its] rights under the Watson Lease by failing to require and request a judicial decree before paying royalties." Although they cite inapplicable Illinois law in

---

[20] The Wellses contend that Devon's denial that it "refines, markets or sells products in the State of Illinois" is also a misrepresentation, but they do not develop this allegation further in their brief. As with their challenge to personal jurisdiction, we therefore consider the issue waived, and decline to address it further. See supra note 12.

[21] See FED.R. APP. P. 10(a). The clerk of court therefore ordered the Wellses to remove the copy of the A.C. Skannal judgment from their brief.

13

support of this argument,[22] the thrust of their reasoning, which they expressed as follows, is well taken: A waiver of a contractual provision may be established by conduct indicating that strict compliance with the provision will not be required. We would clarify the Wellses' argument further by suggesting that, in furnishing the affidavit of heirship form to Yulander Wells in response to his inquiry, in accepting the completed form from him, in releasing some 18 years' worth of accumulated royalty payments on the strength of that form and the completed transfer order, and in continuing thereafter to pay royalties to the Wellses for production on Tract 1, Devon may well have waived strict compliance with the lease term that otherwise requires "a certified copy of a recorded instrument evidencing...[a] transfer."

Even if we grant that this argument has merit, however, only a narrow segment of the Wellses' claim would be preserved. First, as to the Wellses' claims pertaining to tracts other than Tract 1, we agree with the district court that the Wellses failed to provide the types of documentation required by the Watson Lease, and the argument of waiver does not reach those tracts because Devon did not pay accumulated or continuing royalties on them based on the strength of the completed forms returned by Yulander Wells. Second, to the extent that the Wellses may contend that their fractional royalty interest in Tract 1 is

---

[22] Community Convalescent Ctr. of Naperville v. First Interstate Mortgage Co. of Ill., 537 N.E.2d 1162 (Ill. App. 2d 1989).

14

greater than the transfer order reflects because past conveyances gave their ancestors a larger share, we again agree with the district court's grant of Devon's motion for summary judgment. Proof of a larger fractional share would have to include the prescribed "certified copy of a recorded instrument evidencing" past transfers, which the Wellses have not furnished to Devon; and the waiver argument, again, does not alter this conclusion. Obviously, Devon did not pay royalties on the larger fractional shares in Tract 1, whether on the strength of the forms completed and returned by Yulander Wells or on the strength of anything else. Last, as to the Wellses' non-lease-based claims, we agree with the district court that they were never affirmatively pleaded as compulsory counterclaims, as required, and thus we affirm the grant of summary judgment as to those claims. Again, the waiver argument does not alter this analysis: Because the waiver argument would operate only to relax the express terms of the lease contract, the argument is inapplicable to non-lease-based claims.

The only possible aspect of the Wellses' claim that the waiver argument could save, then, is their contention that Devon underpaid royalties on the Wellses' fractional interest —— as reflected in the transfer order —— on Tract 1. Yet even as to this narrow segment of the Wellses' claim, they failed to come forward with summary judgment evidence sufficient to create a genuine issue of material fact to survive Devon's motion for summary judgment. Except for bare, conclusional statements of

15

underpayment, the Wellses have presented no factual basis that would put at issue the question of the monetary amount of the royalties paid on Tract 1.

All of the Wellses' arguments thus fail, and we affirm the district court's grant of summary judgment accordingly.


C. The Ivy Suit

After the district court granted summary judgment in favor of Devon in the Declaratory Action, it then dismissed the Ivy Suit <u>sua</u> <u>sponte</u>, reasoning that the "causes of action underlying Ivy's petition should have been [pled] as compulsory counterclaims in the [Declaratory Action] pursuant to Federal Rule of Civil Procedure 13(a)." Ivy contends that this dismissal was improper and should be reversed for the following reasons: (1) The district court failed to apply the proper choice of law rules in its ruling; (2) the claims asserted in the Ivy Suit were not compulsory counterclaims that should have been pled in the Declaratory Action because Ivy was not aware of the underlying actions from which the Ivy Suit arose when the counterclaim had to be pleaded; (3) the district court in Louisiana had no personal jurisdiction over the plaintiff; (4) the district court had no subject matter jurisdiction over this suit which "only involved cause[s] of action[] under Illinois law"; and (5) the district court relied on Devon's false material statements in reaching its decision. Discerning no merit in Ivy's arguments, we affirm the district court's <u>sua</u> <u>sponte</u> dismissal, as well as

16

the underlying denial of remand by the district court for the Northern District of Illinois.

Ivy's challenges to the choice of law and to the categorization of her claims as compulsory counterclaims may be disposed of simultaneously. As Devon correctly points out, the district court was not faced with a choice of law issue when it dismissed Ivy's suit, because the suit was dismissed on federal procedural grounds when the district court determined that the suit comprised only claims that should have been pleaded as compulsory counterclaims under Federal Rule of Civil Procedure 13(a) in Devon's Declaratory Action. The court therefore did not err in its choice of law.

Neither did the district court err in concluding that Ivy's claims were compulsory counterclaims when it applied the federal procedural rules. The Wellses' mineral interest in the Sligo Field lies at the core of the Ivy Suit; all of Ivy's claims are premised on the understanding that "[p]laintiff is an heir descendant of Mary Lee Griffin Wells and Sammie Ree Wells, who owned certain [immovable] properties and had an interest in the mineral and natural gas production from those properties located in the Bossier and Caddo Parishes in the state of Louisiana," and that Devon "operate[s] over 50% of the oil and gas production" in the same parishes. The fact that all of Ivy's claims derive from the same mineral interests and lessor-lessee relationship as do those underlying the Declaratory Action certainly qualifies them as claims that "arise[] out of the transaction or occurrence that

17

is the subject matter of the opposing party's claim."[23]  In <u>Tank Insulation International, Inc. v. Insultherm, Inc.</u>,[24] we reiterated the questions that a court should address to determine whether a claim was compulsory under Rule 13(a):

> (1) whether the issues of fact and law raised by the claim and counterclaim largely are the same; (2) whether <u>res judicata</u> would bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule; (3) whether substantially the same evidence will support or refute plaintiff's claim as well as defendant's counterclaim; and (4) whether there is any logical relationship between the claim and the counterclaim.[25]

The fourth question in that rule is undoubtedly answered in the affirmative, and as <u>Tank Insulation</u> makes clear, if any of the four questions is answered affirmatively, the counterclaim is compulsory.[26]  The district court therefore correctly concluded that Ivy's claims were compulsory counterclaims.

More responsive to Ivy's contention of error with respect to the compulsory counterclaim determination, however, we deem her attempt to invoke one of Rule 13(a)'s exceptions unavailing. Rule 13(a) provides, in pertinent part:

> A pleading shall state as a counterclaim any claim <u>which at the time of serving the pleading</u> the pleader has against any opposing party....[27]

---

[23] FED. R. CIV. P. 13(a).

[24] 104 F.3d 83 (5th Cir. 1997).

[25] <u>Id.</u> at 85-86.

[26] <u>See id.</u> at 86.

[27] FED. R. CIV. P. 13(a) (emphasis added).

18

Construing Ivy's argument generously, she appears to contend that the claims she asserted in the Ivy Suit were not known to her when the Wellses pleaded their counterclaim against Devon, and that those claims arose, in fact, not from the mineral lease but rather from the discovery of the A.C. Skannal action alluded to above —— which discovery cast Devon's actions toward her and her relatives in a new light. Thus, she argues, she does come under the exception to Rule 13(a), because she did not have the claims alleged in the Ivy Suit "at the time of serving the pleading" of the counterclaim in the Declaratory Action.

Ivy's argument rings hollow for several reasons. First, as a procedural matter, Federal Rule of Civil Procedure 13(e) provides:

> **Counterclaim Maturing or Acquired After Pleading.** A claim which either matured or was acquired by the pleader after serving a pleading may, with the permission of the court, be presented as a counterclaim by supplemental pleading.

If, as Ivy contends, the allegations in the Ivy suit arose from her late discovery of "the Skannal action," nothing prevented her from seeking the district court's permission to include the new claims in a supplemental pleading in the Declaratory Action.

Second, the complaint in the Ivy Suit makes absolutely no reference to her discovery of the A.C. Skannal action, but instead refers simply to Ivy's mineral interest inherited from her parents and to Devon's attempts to devalue, or "render unmarketable," that same mineral interest. On the face of the complaint, therefore, it appears to a certainty that the

19

allegations derive, at least in substantial part, from the mineral interest described in the Watson Lease and the resulting lessor-lessee relationship between Ivy and Devon.

Last, Devon is convincing when it points out that the Wellses' Demand Letters reflect that they had complaints very similar to those alleged in the Ivy Suit, as early as 1999. For example, the Ivy Suit complaint alleges fraudulent concealment, conspiracy to commit fraud, and mail fraud. The May 17l, 1999 Demand Letter, in turn, asserts the following:

> At the outset, I note that you misrepresented various land transactions in an effort to deceptively give the appearance that my clients do not hold mineral interests in Tract 5.....I have discovered that [Devon] began drilling operation [sic] on this land without legal authority in 1950 and in trespass of my clients' undivided mineral interest.... [Devon] possesses full knowledge of this fact and began a conspiracy in 1978 by soliciting the Lewis family to sign off on leases dated April 15, 1978, which were retroactive to July 5, 1950. [T]his illegal complicity continues today....
> ...
> I have commissioned a fifty-year study of leased market rate natural Gas prices and compared the records that [Devon] submitted to my clients in 1980. I noted a vast difference in the actual prices of the market and the prices stated by [Devon]. Clearly, this is prima facie evidence of [Devon's] effort to defraud my clients of the true royalties and circumvent their mineral rights without consideration. ..
> ...
> In summation, my Clients have suffered grievous injuries as a direct results [sic] of [Devon's] material breach of various leases [sic] agreements, participation in conspiracy to defraud the Wells family of correct royalty payment in violation of both federal and state laws, and failure to comply with federal and state regulations regarding

20

> record keeping and contracts, deceptive
> business practice, <u>mail fraud</u>, and securities
> fraud.

The inference from these excerpts is that, as early as May 1999, the entire Wells family had claims essentially identical to those asserted by Ivy in her Illinois complaint. For all of these reasons (Ivy's failure to seek leave of the district court to file a supplemental pleading in the Declaratory Action under Federal Rule of Civil Procedure 13(e); failure of her complaint in the Illinois action even to allude to the <u>A.C. Skannal</u> action; and the highly similar allegations in the May 1999 Demand Letter), we reject Ivy's argument that she did not have the claims alleged in the Ivy Suit "at the time of serving the pleading" of the counterclaim in the Declaratory Action.

Ivy next contends that the federal district court in Louisiana lacked subject matter jurisdiction over the case, and personal jurisdiction over her. Neither of these contentions is adequately briefed. We note nevertheless that, as to subject matter jurisdiction, the parties are of diverse citizenship, and Ivy's complaint —— even though it was filed in Illinois state court originally —— explicitly states that the amount in controversy exceeds the sum of $75,000; and that, as to personal jurisdiction, her complaint is premised on her mineral interest in Louisiana, an immovable, thus establishing a nexus between her and the state sufficient, for purposes of this action, to support personal jurisdiction. Both challenges to jurisdiction therefore fail.

Ivy's next argument mirrors the Wellses' argument discussed in section II(B)(3), supra — that the district court erred when it relied on Devon's purported material misrepresentation that it had received no requisite judicial decree, when in fact, Devon knew of the judgment from the A.C. Skannal judgment.  For the same reasons given above, we reject this argument.  Ivy adds to that claim the further  allegation that the district court relied on a second material misrepresentation by Devon: that Devon denied that it refines, markets or sells products in the State of Illinois.  This allegation is wholly unsupported and inadequately briefed.  We therefore decline to address it.[28]

Thus, all of Ivy's arguments fail.  We consider last, however, whether the district court nevertheless erred in dismissing the Ivy Suit sua sponte; and we conclude that it did not.

The U.S. Supreme Court has recognized that

> [Federal Rule of Civil Procedure] 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law.  This procedure, operating on the assumption that the factual allegations in the complaint are true, streamlines litigation by dispensing with needless discovery and factfinding. Nothing in Rule 12(b)(6) confines its sweep to claims of law which are obviously unsupportable.  On the contrary, if as a matter of law it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations, a claim must be dismissed, without regard to whether it is based on an

---

[28] See Cinel v. Connick, 15 F.3d 1338, 1345 (5th Cir. 1994) (stating that "[a] party who inadequately briefs an issue is considered to have abandoned the claim").

22

outlandish legal theory or on a close but ultimately unavailing one.[29]

Generally, however, a court that exercises its power <u>sua</u> <u>sponte</u> to dismiss a complaint under Rule 12(b)(6) must give the plaintiff notice before doing so, although failure to do so is not necessarily reversible error.  As we stated in <u>Bazrowx v. Scott</u>,[30]

> <u>Generally a district court errs in dismissing a pro se complaint for failure to state a claim under Rule 12(b)(6) without giving the plaintiff an opportunity to amend</u>.  The district court may dismiss an action on its own motion under Rule 12(b)(6) as long as the procedure employed is fair.  <u>True, the district court erred in failing to give Appellant notice</u> of the court's intention to dismiss his suit or an opportunity to amend his complaint.  <u>Such error may be ameliorated, however, if the plaintiff has alleged his best case</u>, or if the dismissal was without prejudice.[31]

As shown above, Ivy was required to assert her claims as compulsory counterclaims in the Declaratory Action if she wished to assert them at all.  Having failed to do so, she was forever barred from asserting those claims, from which the district court could correctly conclude that, "as a matter of law[,] it is clear that no relief could be granted under any set of facts that could

---

[29] <u>Neitzke v. Williams</u>, 490 U.S. 319, 326–27 (1989) (superseded by statute on other grounds) (internal quotation marks and citations omitted) (emphasis added).

[30] 136 F.3d 1053 (5th Cir. 1998).

[31] <u>Id.</u> at 1054 (internal quotation marks and citations omitted) (emphasis added).

23

be proved consistent with the allegations,"[32] and could conclude further that Ivy had "alleged [her] best case,"[33] thus warranting dismissal of the claims without prior notice to Ivy.  We therefore echo our earlier conclusion from <u>Bazrowx</u>:

> [O]ur careful and thorough <u>de novo</u> review satisfies us that, as it stands, [Ivy's] complaint does fail to state a claim for which relief could be granted.  Given that conclusion..., any error in failing to give notice and allow amendment is harmless.[34]

The district court's <u>sua</u> <u>sponte</u> dismissal of the Ivy Suit is therefore affirmed.

### III. Conclusion

For the foregoing reasons, the district court's grant of summary judgment in the Declaratory Action and dismissal <u>sua</u> <u>sponte</u> of the Ivy Suit are

AFFIRMED.

---

[32] <u>Neitzke</u>, 490 U.S. at 327.

[33] <u>Bazrowx</u>, 136 F.3d at 1054.

[34] <u>Id.</u> at 1054-55.